TOMMIE ALEN STORY, ET AL.

V.

WILLIAM H. HARGRAVE, EXECUTOR, ETC.

Record No. 850383

June 10, 1988

Present: All the Justices

*Oldric J. LaBell, Jr.* (*Philip L. Avis; Herbert Wornom, III*, on brief), for appellants.
*W. Parker Councill* for appellee.

RUSSELL, J., delivered the opinion of the Court.

This appeal presents the question whether a contract to make a will leaving specific property to the appellants in exchange for personal services, anticipatorily breached by the testatrix, should be enforced in equity.

Ilevia Vellines was born in 1904. She was unmarried and lived alone on her 59-acre farm in Isle of Wight County. Her nearest relatives were second cousins. She could neither read nor write, but was, in 1980, mentally alert, fully competent to make her own decisions, and physically capable of caring for herself. She had a trailer parked next to her house and had a succession of married couples living in it during the late 1970's. She did not want to be entirely alone on the farm, and she was concerned that if no one were available to care for her in her later years, she might be forced to enter a nursing home.

A number of years before, Miss Vellines had become very fond of Helen M. Story, the wife of Tommie Alen Story. The Storys had lived in the neighborhood until they moved to Tennessee in 1978. In early 1980, Miss Vellines asked a neighbor to write to Helen Story, initiating the suggestion that the Storys return to Virginia and live with her on her farm in exchange for her agreement to leave her property to them in her will. Mrs. Story visited her in March 1980 and discussed the matter further. Having reached agreement, Mrs. Story moved from Tennessee to Miss Vellines' home on March 15, 1980.

Mr. Story, who was reluctant to enter into the arrangement, remained in Tennessee for a few weeks to wind up the Storys' affairs there. He moved into Miss Vellines' home in late April 1980. Miss Vellines asked her attorney to prepare a written agreement between the parties, as well as a will. The contract was signed by all three parties in the attorney's office on April 25, 1980. One of the attorneys in the office witnessed Miss Vellines' mark.

The contract provided that the Storys "shall live in the home of, or in a separate home or mobile home upon the property" of Miss Vellines, that either or both of them would "see to [her] day to day care and maintenance," that Miss Vellines would furnish all funds necessary, and that the Storys would not cause her to be placed in a nursing home except on the written recommendation of two physicians. For her part, Miss Vellines agreed to execute a valid will, devising and bequeathing to the Storys "all real and personal property of which she may die seized," less the payment

of debts, taxes, and funeral expenses. The contract further provided that if the Storys should fail to see to Miss Vellines' care in a reasonable manner, the contract would be void, but Miss Vellines would nevertheless pay the Storys a reasonable sum for their time spent, less a reasonable rental for their occupancy of her property.

At the same time, Miss Vellines executed a will, pursuant to the contract, which left all her property, after the payment of debts, taxes, and funeral expenses, to the Storys. No question is raised with regard to Miss Vellines' testamentary capacity.

In the summer of 1980, Miss Vellines conveyed a six-acre parcel of land to a neighbor, Lula I. Hargrave, as recompense for past services rendered by Mrs. Hargrave. The Storys were aware of this conveyance and made no protest.

Mrs. Story was engaged in the day-to-day care of Miss Vellines. She did the washing, laundry, cleaning, and sewing and, for a time, prepared two hot meals each day. Miss Vellines was capable of doing these things for herself, but preferred to work outdoors in the yard and leave the housework to Mrs. Story. Mr. Story found employment in Smithfield.

The Storys remained in the house until July. Miss Vellines, who slept poorly, complained of the noise of a fan they used in their bedroom during warm weather. She forbade them to install an air conditioner, which they offered to do at their own expense, because of anticipated noise. She later forbade them to use either the bathroom or the kitchen after 9:00 p.m. To avoid these strictures, the Storys expended $12,500 of their own funds to purchase a mobile home and located it immediately beside the house, close enough that Miss Vellines could call to them through an open window. Miss Vellines' older trailer was moved behind the house. After July 15, 1980, the Storys spent their nights in the mobile home unless a storm occurred, when they would stay with Miss Vellines, who feared storms.

In the fall of 1980, Miss Vellines agreed to convey a 12-acre parcel of land to a neighbor, Ralph Davidson, for a deferred price which the Storys considered grossly inadequate. Mr. Story, learning of the proposal, told Miss Vellines that she had no right to convey the land. Miss Vellines later said that she had only agreed to sell the land "for spite."

Following this disagreement, Miss Vellines became apprehensive that the Storys might move away and the Storys were con-

cerned that she might dissipate her estate. The parties again went to an attorney employed by Miss Vellines and secured the preparation of an addendum to their April 25 contract. The addendum, dated September 3, 1980, provided that Miss Vellines would not incur any debts over $100 without the Storys' consent, that she would not transfer or encumber any real property without their consent, that one of the Storys would be a signatory on all checks written by Miss Vellines, and that the Storys would not move their mobile home, and would thereafter continue to live in it, "barring unforeseen emergencies." The addendum ratified the April 25 contract, and the parties acknowledged both documents and caused them to be recorded in the clerk's office.

Thereafter, Miss Vellines expressed resentment at the restrictions imposed upon her by the agreements. She became very vexed with Mr. Story during the winter for cutting wood on a Sunday and threatened to shoot him. He desisted, and the sheriff removed a gun she kept in the house, but the relationship remained poor. In January 1981, Miss Vellines repudiated the contract and addendum and consulted new counsel who, at her direction, wrote to the Storys demanding that they leave her property. They refused to vacate the mobile home.

Miss Vellines brought the present suit on February 5, 1981, seeking an injunction to remove the Storys. The Storys filed a cross-bill, seeking to enjoin Miss Vellines from disposing of her property, seeking the imposition of a constructive trust, and other relief. In February 1981, the court ordered the Storys to vacate the property without prejudice to the merits of the case. Subsequently, it was determined that Miss Vellines had contracted a terminal illness. Her *de bene esse* deposition was taken in January 1982, and she died the following month.

In September 1981, Miss Vellines revoked her prior wills and executed a new will, devising her residual property, after certain small legacies, to William H. Hargrave and Lula I. Hargrave, a couple with whom she lived after the departure of the Storys. Mr. Hargrave was named executor and, after Miss Vellines' death, was substituted as defendant to the Storys' cross-bill.

On May 7, 1984, the chancellor heard evidence *ore tenus* on the Storys' cross-bill and admitted the depositions of Miss Vellines and others. At the close of the evidence, the court stated that the evidence showed that Miss Vellines had breached the contract,

but that the Storys were entitled to damages rather than specific performance.

The case was continued for argument on the measure of damages. After hearing argument and receiving memoranda, the chancellor ruled in a letter opinion dated November 16, 1984: "I have concluded that while Miss Vellines breached her part of the contract, the Storys were not entirely without fault in this matter." The court concluded that the Storys were entitled to a judgment against the estate for the costs of moving to and from Miss Vellines' property, in addition to damages at the rate of $1,000 per month from April 25, 1980 to February 1981 "for services rendered."

On February 21, 1985, the court entered a final decree which recited that Miss Vellines had repudiated the contract, but that her repudiation was "justified by the circumstances." The decree awarded the Storys a judgment against the estate for $9,500.00. We granted the Storys an appeal.

■ The court's finding that Miss Vellines had anticipatorily repudiated the contract, preventing full performance by the Storys, was fully supported by the evidence. Indeed, that finding is undisputed. On appeal, the dispute is whether the court's further findings, that "the Storys were not entirely without fault in this matter" and that the repudiation "was justified by the circumstances," were supported by the evidence. Our review of the record discloses no support for those findings.

■ The Storys were obligated to live with Miss Vellines and to "see to" her "day to day care and maintenance." They were required to perform these services "in a reasonable manner," not to her subjective personal satisfaction. There is no evidence that they failed to perform their contract obligations at any time, except when Miss Vellines prevented them from doing so. Miss Vellines, in her deposition, complained that Mr. Story had "an argument" with her concerning her intended conveyance of 12 acres to Ralph Davidson. Because they had an equitable interest in her property, the Storys had every right to engage in such an "argument," and their doing so constituted no breach of their contractual obligations.

■ Miss Vellines also complained that the Storys left her unattended for one night. Mrs. Story, and friends of Miss Vellines who testified at trial, explained that this occurred on the occasion of the death of Mrs. Story's mother and that the Storys left to attend

her funeral. Before leaving, however, they arranged for a neighbor who was a close friend of Miss Vellines to stay with her during their absence. This explanation was unrefuted. Asked in oral argument to cite any other evidence of breach on the Storys' part, counsel was unable to do so. We conclude that the chancellor's finding of justification for Miss Vellines' repudiation was erroneous.

We turn to the question of appropriate relief. The chancellor's award of $1,000 per month as compensation to the Storys for their services was not supported by evidence from which an "intelligent and probable estimate" could be made. *See Dillingham* v. *Hall*, 235 Va. 1, 4, 365 S.E.2d 738, 739 (1988).

This case falls into a category controlled by *Wright* v. *Dudley*, 189 Va. 448, 53 S.E.2d 29 (1949). There, we determined that a parol contract to make a will in exchange for personal services was taken out of the statute of frauds by partial performance. The trial court had refused to grant specific performance to the promisee, but decreed that she was entitled to compensation by way of damages. We reversed, holding that the promisee's claim was not compensable in damages and that she was entitled to the benefits of her contract. In that case, as in this, the contract made it obvious that the parties never contemplated any other form of compensation to the promisee, after performance by the promisee, than the transfer of the promisor's property at her death. *Id.* at 455, 53 S.E.2d at 32.

As in the present case, the promisor in *Wright* had anticipatorily repudiated the contract during her lifetime, and then died during the pendency of the suit. We noted that an agreement to dispose of property by will cannot be specifically enforced during the promisor's lifetime because of the revocable nature of wills, and that it cannot be specifically enforced after the promisor's death because the promisor can then no longer make a will. Nevertheless, we held that a court of equity can do equivalent justice by compelling those to whom legal title has descended to convey and deliver the property according to the terms of the contract "upon the grounds that it is charged with a trust in the hands of the heir at law, devisee, personal representative or purchaser, with notice of the agreement, as the case may be." *Wright*, 189 Va. at 457, 53 S.E.2d at 33.

A will executed pursuant to an agreement based upon valuable consideration to make a will cannot be revoked by the testator so as to defeat the devise or bequest made by it in accordance with the testator's agreement. The execution of such a will *establishes a trust in the property* devised or bequeathed pursuant to the agreement and may be enforced in equity against the testator's heirs or those claiming under a subsequent will.

*Everton* v. *Askew*, 199 Va. 778, 783, 102 S.E.2d 156, 159 (1958) (emphasis added).

■ Here, the contract between the parties was clear and definite in its terms and the parties were *sui juris*; the promisees gave up their home and employment in Tennessee and moved to the promisor's home to care for her. The promisees fully performed their part of the agreement in good faith until the promisor repudiated it and prevented their further performance. They are entitled to the consideration for which the contract provided.

Accordingly, we will reverse the decree and remand the case for the entry of decrees imposing a trust upon the property of which Miss Vellines died seized, subject to the payment of debts and taxes due at her death and subject to her funeral expenses, and directing such conveyances and transfers as shall carry into effect the views expressed in this opinion.

*Reversed and remanded.*